# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

**JAMES L. WENZEL,**

Case No. 1:15-cv-1371-CL

Plaintiff,

v.

**REPORT AND RECOMMENDATION**

**KLAMATH COUNTY FIRE DISTRICT NO. 1; BOARD OF DIRECTORS OF KLAMATH COUNTY FIRE DISTRICT NO. 1** in their capacity as the decision making body of Klamath County Fire District No. 1; **STEPHEN ROBERT HEDLUND**, individually and in his capacity with Klamath County Fire District No. 1 and dba Hedlund & Hedlund; and **JIM TODDY**, individually and in his capacity with Klamath County Fire District No. 1 and dba Jim Toddy Investigations,

Defendants.

_____

CLARKE, Magistrate Judge.

Plaintiff James Wenzel brings this action against defendants for violation of his due process rights under the United States Constitution. Plaintiff also brings state law claims for breach of contract and interference with contract, wrongful and negligent investigation, negligent retention and supervision, wrongful discharge, breach of the covenant of good faith and fair dealing, legal malpractice, negligent misrepresentation, and intentional misrepresentation. This case comes before the Court on defendants' motions for summary judgment (#115, #118, & #120). For the reasons below, defendants' motions should be GRANTED in part and DENIED in part. The case should be set for trial as to the Plaintiff's claims against KCFD1 for violation of due process rights, breach of contract, wrongful discharge, and breach of the covenant of good faith and fair dealing, and his claims against Hedlund and Toddy for tortious interference.

## FACTUAL BACKGROUND

Plaintiff became the Fire Chief of Klamath County Fire District No. 1 ("KCFD1") on January 1, 2008. Storey Decl. ¶ 3. Plaintiff's position as Fire Chief was originally subject to an agreement signed in December of 2007 by Plaintiff and a representative from the KCFD1 Board of Directors ("Board"). Storey Decl. Ex. 1.

In 2010, Plaintiff entered into a second agreement with KCFD1 instead of allowing the original to auto-renew. Storey Decl. ¶ 5. This new agreement contained a clause stating that Plaintiff's employment would automatically extend for three years unless KCFD1 issued a letter of intent to not renew the agreement at least 120 days before its expiration on December 31, 2013. Storey Decl. Ex. 2, Section 2. The agreement also contained a clause about discipline, stating that KCFD1's general disciplinary policies applied to Plaintiff, and that he may be terminated "for cause." Storey Decl. Ex. 2, Section 8. However, this clause also states that "[n]othing in this Agreement shall be construed to include any requirement that [KCFD1] have

specific cause for non-renewal of the employment agreement in accordance with the terms set forth herein." *Id.* On KCFD1's general disciplinary policies, Plaintiff refers to KCFD1's Policies and Procedure Manual, of which section 8.11 discusses disciplinary practices. Wenzel Decl. Ex. B. Plaintiff notes that the manual requires "progressive discipline" and specifically an adequate notice and a hearing before discharge. *Id.*

Plaintiff contends that, up until the events at issue in this litigation, he received no disciplinary action of any kind as Fire Chief for KCFD1, nor in connection with any other job during his 40 year fire-fighting career. Wenzel Decl. ¶¶ 2,5. On March 16, 2010, the Board voted unanimously to support Plaintiff as a member of the Oregon Fire Chief's Association ("OFCA"). Wenzel Decl. Ex. D. As a result, the acting president of the Board, Gloria Storey ("Storey"), sent OFCA a letter on behalf of KCFD1. Wenzel Decl. Ex. C. This letter stated that the Board would support Plaintiff in running for the four-year position of Director for the OFCA, including providing Plaintiff's "time and associated expenses." *Id.* In a deposition, Storey testified that providing "associated expenses" meant the Board was paying Plaintiff's salary. Storey Dep. 127:1-3.

## Events Preceding the Investigation

Beginning in 2010, Defendant Steven Hedlund ("Hedlund"), an attorney in private practice, was retained as the attorney for KCFD1 and the Board. Storey Decl. ¶ 8. Hedlund's position was subject to a contractual agreement, and Hedlund was never an employee of KCFD1. Storey Decl. ¶¶ 8-9; Ex. 3. Plaintiff contends that, over time, Hedlund's role evolved from legal advisor into that of an influential Board member, leading Plaintiff to complain to Storey that "[Hedlund] was acting more like a sixth Board member than an attorney...." Wenzel Decl. ¶ 16.

In early 2013, KCFD1 remained involved in negotiations to develop a new agreement with the firefighter's union. Wenzel Decl. ¶ 17. The former agreement required KCFD1 to maintain minimum staffing levels by calling in workers on overtime to fill vacancies left by vacation or sick leave. *Id.* During labor negotiations, on March 7, 2013, Hedlund emailed Plaintiff regarding his plan to eliminate overtime via lowering minimum staffing levels. Wenzel Decl. Ex. F. On March 13, 2013, Hedlund sent another email to Plaintiff questioning why he had not eliminated overtime per the Board's request. *Id.* Plaintiff, as lead negotiator for KCFD1, believed that the former agreement was still operative, and that making unilateral changes to minimum staffing levels would be unlawful and an unfair labor practice. Wenzel Decl. ¶¶ 17-18. Accordingly, Plaintiff refused Hedlund's request and did not eliminate overtime. *Id.* at ¶ 19.

Plaintiff further states that he contacted Storey to resolve the disagreement between himself and Hedlund. *Id.* at ¶ 20. This resulted in a private meeting between Plaintiff, Storey, and Hedlund on March 19, 2013, right before a monthly KCFD1 board meeting. *Id.* Plaintiff states that, during the private meeting, there was a confrontation between himself and Hedlund over unilaterally changing minimum staffing levels. *Id.* Plaintiff further states, "I pointed out that [Hedlund] was the only person in the room who faced no risk as a result of violating the law in this way," and that "Hedlund was angry and embarrassed as a result of the confrontation and being wrong on the legal issue." *Id.*

Beginning on that same evening, March 19, 2013, a series of emails regarding Plaintiff were exchanged or catalogued by Hedlund. Plaintiff notes that, prior to these communications, nothing produced in discovery shows defendants had discussed taking disciplinary action against him. Ford Decl. ¶ 19. In the first email on March 19, Hedlund told Storey that he "had put some thought into what the chief said and decided to: 1) look internally and 2) be proactive." Ford

Decl. Ex. G. Storey responded the next day by encouraging Hedlund and assuring him of his value to the Board. *Id.* On March 20, Hedlund cataloged an email to himself stating that he had received information and concerns regarding Plaintiff's actions as chief. Ford Decl. Ex. H. These concerns included that Plaintiff was frequently absent from the office, he had used a company credit card for personal use, and he had presented false information to the Board regarding meeting attendance. *Id.*

On March 22, Storey emailed Hedlund the following: "I received a call from John Spradley tonight. He wants to meet me tomorrow regarding the chief. He didn't want me to involve you yet. I will let you know what it is ail about." Ford Decl. Ex. I. Indeed, Storey states that in "early 2013" she was approached by John Spradley ("Spradley"), who was a division chief for KCFD1, and two other members of the KCFD1 management team who expressed concerns about Plaintiff. Storey Decl. ¶¶ 10-12; Spradley Decl. ¶ 3. Specifically, Storey states some of the concerns indicated that Plaintiff may have violated KCFD1 policies regarding travel reimbursements, reports to the Board, and the duties as fire chief. *Id.* at ¶ 13.

On March 25, Hedlund emailed Kirk Peterson, another attorney who worked for KCFD1, about Plaintiff. Ford Decl. Ex. J. Here, Hedlund asked Peterson whether he should take Plaintiff's keys and keep him off KCFD1 property during the investigation. *Id.* Hedlund noted that he had requested Plaintiff not speak with any Board members, and that an interim chief may be appointed by the evening of March 26. *Id.* Also on March 25, Hedlund and Storey exchanged emails to plan for an emergency board meeting to take place on March 26. Ford Decl. Ex. K. At one point, Hedlund suggested that they "[d]on't give [Plaintiff] an opportunity to speak or address the issues." *Id.* Hedlund also suggested placing Plaintiff on paid leave pending an investigation, and discussed with Storey the possibility of appointing an interim chief. *Id.*

## March 26 Board Meeting

On March 25, Hedlund emailed Plaintiff to notify him of the emergency board meeting

taking place on the following day. Wenzel Decl. ¶ 21; Ex. G. In the email, Hedlund gave

Plaintiff the choice of holding the meeting in either open or executive session, and Plaintiff

responded that he preferred an executive session. Wenzel Decl. Ex. G. Hedlund also stated, "[I]t

is my belief there will not be any hearing process tomorrow, more of a matter to inform you the

nature of the claims being made against you." *Id.*

During the March 26 board meeting, in executive session, Storey read the following

statement:

> Chief Wenzel, the purpose for tonight's meeting is to inform you that the Board of
> Directors has received negative information regarding your performance as Chief of the
> Fire District. This is not the time for either the Board or for you to inquire or investigate
> this information. Pursuant to your employment agreement, you are entitled to due process
> in the investigation and resolution of this matter. The information the Board has been
> presented pertains to violations that generally allege the following: Violation of vacation
> policies of the employment agreement; dishonesty in regard to monthly reports provided
> to the board; and failure to perform the duties of Fire Chief as described in the District's
> job description and employment agreement. This list is not all inclusive. If determined to
> be true, these allegations could result in disciplinary action up to and including
> termination. At this time, the Board is not discussing any action in this matter other than
> to inform you of the general allegations. No response is requested from you at this time,
> but these are allegations which need to be investigated to determine their validity.

Wenzel Decl. Ex. I.

While still in executive session, the Board decided to investigate the allegations against

Plaintiff using an outside investigator. *Id.* Hedlund suggested defendant Jim Toddy ("Toddy")

for the position, stating that he was a "retired Oregon State Police detective and a former

detective for the Klamath County District Attorney's Office." *Id.* Hedlund further stated that, if

available, he believed Toddy would perform a discrete investigation, and that Plaintiff could

refute allegations once Toddy gathered the necessary information. *Id.* The Board agreed that

Hedlund should obtain the private investigator for confidentiality considerations, *id.*, and voted in open session to allow him to do so, Storey Decl. Ex. 5.

Whether the Board took adequate steps to ensure that Toddy could adequately perform the investigation competently and in an unbiased manner remains disputed. Storey testified in depositions that no background check of Toddy was performed, KCFD1 Dep. 193:15-17, nor was he interviewed, *id.* at 194:7-10, the Board sought no references for Toddy, *id.* at 193:22-25, and the Board was unaware that Toddy was not licensed as a private investigator, Storey Dep. 40:12-15. From deposition testimony, it appears neither Toddy nor Hedlund had any training or experience in workplace investigations, specifically. On Toddy's experience, he testified the following:

> Q: Okay. Maybe we should be sure we define our terms. What would you describe as a "workplace investigation"?
> A: Citizen's complaint against one of our troopers, vehicular crashes, falsifying reports, theft.

Toddy Dep. 20:16-22. Toddy further testified that he had performed one other outside investigation of an employee accused of theft while with the Klamath County District Attorney's office. *Id.* at 21:21-22:24. On Hedlund's experience, he testified the following:

> Q: Okay. Do you have any experience with workplace investigations?
> A: No.
> Q: Have you ever done any training or studied in the area of workplace investigations?
> A: No.

Hedlund Dep. 20:23-21:3.

Per his employment agreement with KCFD1, Toddy was to report only to Hedlund during the investigation. Toddy Decl. Ex. 1 Section 3. Hedlund told the board he had known Toddy for 15 years, Wenzel Decl. Ex. I, and Toddy states that he met Hedlund while the two

worked at the Klamath County District Attorney's office. Toddy Decl. ¶ 6. Toddy also states that

he and Hedlund do not have a social relationship, and that they did not spend time together

outside of work while at the district attorney's office. Toddy Decl. ¶ 6. Hedlund said the

following in deposition on why he recommended Toddy to the Board:

> Q: Did you ever do any research into the issue of what qualifications might
> be required for a workplace investigation?
> A: No.

Hedlund Dep. 108:16-19;

> Q: Okay. What did you think Mr. Toddy's qualifications were to conduct
> this investigation?
> A: He handled – I don't know how many different criminal investigations
> during the course of his career. My personal opinion, right or wrong, is that
> criminal investigations are probably more difficult than workplace
> investigations to make determinations; so I felt he was qualified.

Hedlund Dep. 109:6-109:13.

Storey states that the Board hired Toddy based on his experience as a state police officer

and as an investigator for the Klamath County District Attorney. Storey Decl. ¶ 15. She also

states that when Toddy was hired, she was not aware of any reason why he would not be an

effective and fair investigator, *id.*, and testified that she could not recall KCFD1 performing any

background checks on outside contractors, KCFD1 Dep. 193:18-21.

## Investigation Period

Toddy logged that his investigation of Plaintiff took place from April 3 to June 23, 2013.

Toddy Dep. Ex. 116. During that time, Toddy reviewed documents, recorded interviewing 15

witnesses, and wrote a report on his findings. Toddy Dep. Ex. 116; Toddy Decl. ¶ 9.

The appropriateness of Toddy's motives and conduct during the investigation remain in

dispute. Toddy stated he was not concerned with rumors that could result from the questions he

asked witnesses, Toddy Dep. 67:13-20, that he could not remember telling interviewees anything

about confidentiality, Toddy Dep. 106:7-9, and that the scope of what he discussed with each witness was about the same for all witnesses. Toddy Dep. 83:5-8. Toddy also took notes of his interviews but destroyed them, and there are no audio recordings of the interviews. Toddy Dep. 52:18-24; 107:1-3. Toddy states that his only purpose in conducting the investigation was to serve the Board's goal of determining whether Plaintiff had violated KCFD1 policies. Toddy Decl. ¶ 7. Toddy further states that he kept all information about the investigation confidential, as required by his employment agreement. *Id.* at ¶ 8. Finally, Toddy states that he did his best to be fair and neutral during the investigation, attempted to find the truth in all matters addressed in his report, and did not include anything in the report that he believed was untrue. *Id.* at ¶ 10.

During the investigation, Toddy required each interviewee to sign what Plaintiff refers to as a "Garrity Warning" (Warning). Hedlund wrote the Warning and advised Toddy to give it to all interviewed witnesses. Toddy Dep. 58:1-10; Hedlund Dep. 129:2-3. Hedlund testified that he believed Toddy should use the Warning because he was concerned witnesses might not provide accurate information when asked questions that could create issues with their supervisor, Plaintiff. Hedlund Dep. 129:13-130:1. Plaintiff also signed a copy of the Warning, Wenzel Decl. Ex. J, which was the same as was signed by all other witnesses, Toddy Dep. 121:15-17. In part, the Warning stated the following:

> Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding. If you knowingly and willfully provide false statements or information in your answers, you may be disciplined up to and including discharge. The answers you furnish and any information or evidence resulting there from may be used in the course of disciplinary proceedings.

Wenzel Decl. Ex. J.

Storey states that, to her knowledge, Toddy performed the investigation without direct supervision from the Board or anyone else. Storey Decl. ¶ 17. During the investigation, however,

Hedlund cataloged or emailed Storey accusations and evidence against Plaintiff. Ford Decl. Ex. H; P; Q. There are other emails where Hedlund and Storey discussed the gathering of documents and records. Ford Decl. Ex. L; M; N; SS. Hedlund also emailed Toddy about a meeting with Spradley. Ford Decl. Ex. O.

On June 5, 2013, Plaintiff emailed Hedlund stating that Toddy may be "unprofessional and dishonest." Wenzel Decl. Ex. L. Plaintiff also attempted to contact Storey multiple times to tell her the investigation was being performed with bias and unfairness, but Storey did not speak to Plaintiff during that time. Wenzel Decl. ¶ 29; Ford Decl. Ex. DD.

Toddy did not interview Plaintiff at any time during the investigation. While Toddy briefly met with Plaintiff on May 29, 2013, this was to gather documents and have Plaintiff sign the Warning. Wenzel Decl. ¶ 26. Toddy initially scheduled an interview with Plaintiff for June 14, 2013. Toddy Decl. ¶ 9. Plaintiff states that out of concern the investigation was being conducted unfairly, he retained counsel, Karen Ford ("Ford"). Wenzel Decl. ¶ 30. On June 13, Ford emailed Toddy and Hedlund to reschedule the interview. Toddy Dep. Ex. 125.

A disputed issue is whether Hedlund and Toddy intentionally avoided interviewing Plaintiff before reporting their findings to the Board. Toddy states that because the interview with Plaintiff was never rescheduled, he was unable to speak with Plaintiff about the investigation. Toddy Decl. ¶ 9. However, Toddy also testified that he understood Ford's email to mean he should not speak with Plaintiff, and that Hedlund told him, "[Plaintiff] retained an attorney. Don't talk to him." Toddy Dep. 101:1-102:21.

Plaintiff further states that he did not immediately attempt to reschedule an interview with Toddy because he was waiting for information on the specific charges against him. Wenzel Decl. ¶ 32. On June 13, Ford emailed Hedlund to request information on the specific charges

against Plaintiff. Ford Decl. Ex. R. The next day, Hedlund responded, in part, by saying the following:

Perhaps it would be easiest if I have Mr. Toddy prepare the results of his investigation without any information from the Chief, and provide that to me in a written report. Then the report can be forwarded to you and Chief Wenzel so you have the details you are requesting, and Mr. Toddy can meet with the Chief after he has had an opportunity to review the documents.

*Id.* Hedlund's response also stated that the allegations against Plaintiff were the same as the ones read by Storey at the March 26 board meeting. *Id.* On June 19, Ford then responded that the allegations read at the March 26 meeting were too generalized to provide any information, and that Plaintiff would wait for Toddy's report before responding to anything. Ford Decl. Ex. S.

On July 16, 2013, Hedlund emailed Ford a copy of a summarized report from Toddy's investigation, which Hedlund had received on or about July 12. Ford Decl. Ex. T. In the email, Hedlund stated that if Plaintiff would like to answer the claims in an interview with Toddy, the interview needed to take place before July 26. *Id.* The next day, Ford responded that she would like access to the full report before Plaintiff be interviewed by Toddy. Ford Decl. Ex. U. On July 22, Hedlund sent Ford a copy of Toddy's full report ("Toddy Report") from the investigation. Ford Decl. Ex. W.

On July 25, Ford emailed Hedlund that she and Plaintiff had looked at the Toddy Report, and requested KCFD1's agreement with Toddy and a copy of his resume or CV. Ford Decl. Ex. Z. On July 26, Hedlund responded by denying Ford's request for information on Toddy. *Id.* Hedlund also stated that if Plaintiff was disputing the claims, he had a right to a hearing before the Board, and that the Board would likely meet on August 6 to pick a date for the hearing. *Id.* On July 29, Ford responded by requesting a hearing before the Board and that the Toddy report be kept confidential. Ford Decl. Ex. AA. In additional emails, Hedlund assured Ford that a

hearing before the Board would be scheduled, possibly for sometime in September, 2013. Ford

Decl. Ex. BB.

## Special Board Meeting on August 6, 2013

The Board held a special meeting on August 6, 2013 regarding Toddy's investigation of

Plaintiff. Ford Decl. Ex. MM. Before the meeting, some Board members had read the

summarized report and others had read parts of the full Toddy Report. Wenzel Decl. Ex. N, lines

9-12. The transcript shows that the Board contemplated terminating Plaintiff in the special

meeting:

> DENNIS THOMPSON [Board member]: No matter what he says, or what he tries to do!
> It's just over with him! There is no way he can come back.

Wenzel Decl. Ex. N, lines 55-56.

> MIKE JONES [Board member]: Uh, that summary letter pretty much outlined it for me!
> That, I mean, you can't, you can't, uhh, misuse government tax payers' dollars and just
> get away with it! His abuse of his leave, his lying to the board about his time, his
> meetings, I mean, my god, uh, if it was my business, ya, if was my business and my
> company I think I would, wouldn't stand for it and the person would be fired! And I
> understand it is a little different situation here but uhm, honestly, I think we should, uhm,
> terminate him based on all the (talked over by Gloria Storey) information here!
> GLORIA STOREY: Terminate him? Or just let his contract ride out for the rest of the
> year?
> MIKE JONES: Nope. Terminate him!

Wenzel Decl. Ex. N, lines 35-42.

GLORIA STOREY: If all this transpires and we appoint John as the Chief Monday night.

Wenzel Decl. Ex. N, line 118. In other parts of the transcript, board members discuss the option

of non-renewal instead of termination. Wenzel Decl. Ex. N, lines 56-64; 68-69; 73-76.

## The Toddy Report

Toddy wrote an extensive report, over 1000 pages long, on the findings of his

investigation, and delivered a paper copy to Hedlund. Toddy Decl. ¶ 12. Board members were

only given access to the Toddy Report in Hedlund's office. Storey Decl. ¶ 20. Additionally, Storey states that no electronic or paper copies of the Toddy Report were distributed, it was never discussed in open session of a board meeting, and the report's existence was never mentioned outside of KCFD1. *Id.*

The accuracy of the Toddy Report remains in dispute. The Toddy Report states that Plaintiff abused sick leave, based on his personal calendar on his work computer. Wenzel Decl. ¶ 44. It also states that Plaintiff lied about attending an OFCA meeting, based on Toddy's discovery that Plaintiff did not attend the meeting in person and there was no record of a cell-phone call. *Id.* at ¶ 45. In a later address to the Board, Plaintiff contended that these statements, and many others in the report, were untrue or misleading by only stating selective evidence. Wenzel Decl. Ex. P; Storey Decl. ¶ 23. Plaintiff also made these contentions shortly after he was first provided with the Toddy Report. On July 17, Ford emailed Hedlund that Plaintiff noticed many factual mistakes in the summarized report. Ford Decl. Ex. U. On July 29, Ford emailed Hedlund that the full Toddy Report contained false and misleading statements that Plaintiff could easily refute. Ford Decl. Ex. AA.

Storey states she read the summarized report, but that, by the time the report was released, it had little bearing on the question of whether to renew Plaintiff's contract. Storey Decl. ¶ 21. Storey further states that the deteriorating financial situation of KCFD1, in particular, was among other information more important than the Toddy Report. *Id.* Indeed, in May 2013, the Board was informed that KCFD1 would have to borrow \$2.1 million to fund operations through the 2012-13 fiscal year. *Id.* at ¶ 18. Storey states that this was troubling to her because it was more than KCFD1 had borrowed, and was part of a pattern of increased, earlier borrowing over the previous five years. *Id.* She also states that she saw this pattern as evidence of the poor

performance by Plaintiff, as managing KCFD1's finances was one of his most important responsibilities as fire chief. *Id.* at ¶ 19.

## Board Meeting on August 19, 2013

On August 16, 2013, Hedlund emailed Plaintiff that a special board meeting was scheduled for August 19, and the renewal of Plaintiff's contract would be discussed. Wenzel Decl. Ex. O. Upon learning of this meeting, Ford emailed Hedlund to request a hearing for Plaintiff to address the investigation. Ford Decl. Ex. CC. In that email, Ford also offered that the parties form an agreement to delay the deadline for the renewal decision so Plaintiff could sufficiently address the accusations against him. *Id.*

At the August 19 board meeting, there were two executive sessions regarding the renewal of Plaintiff's employment contract. Storey Decl. ¶ 23. With Plaintiff excluded, the first executive session began with Hedlund reading an email from Ford, who offered an agreement where Plaintiff would waive the 120 day notice requirement for non-renewal so he could address the allegations against him before the Board's decision. Wenzel Decl. Ex. Q 3:19-6:22. The Board then discussed Plaintiff's performance as fire chief, non-renewal of his contract, and placing him on administrative leave until the end of his contractual term. Wenzel Decl. Ex. Q. In the second executive session, Plaintiff addressed the Board to make a case for renewing his contract. Storey Decl. ¶ 23. In making his case, Plaintiff read a memo addressing some accusations in the Toddy Report and stating that the meeting did not allow an adequate opportunity to present a full response. Wenzel Decl. ¶ 39; Ex. P. Plaintiff states that the board members did not ask him any questions, nor did they discuss anything in his presence. Wenzel Decl. ¶ 39.

Once in open session, the Board voted unanimously to not renew Plaintiff's contract. Storey Decl. Ex. 7. The Board then voted unanimously to appoint Spradley as interim fire chief

and place Plaintiff on paid administrative leave. *Id.* Storey states that, during open session, there was no discussion of the reasons for the Board's decision not to renew Plaintiff's contract. Storey Decl. ¶ 24.

The day after the board meeting, on August 20, Plaintiff received a letter from Storey to officially notify him of the non-renewal and paid leave. Wenzel Decl. Ex. R. The letter also designated Spradley as the interim chief and requested Plaintiff return all KCFD1 property. *Id.* Regarding Toddy's investigation, the letter further stated, "If you would still like to have a hearing please have Ms. Forde (*sic*) notify Mr. Hedlund before August 30, 2013, at 5:00 PM, so we can accommodate scheduling with the Board."

On August 20, Spradley issued a press release announcing that Plaintiff's contract would not be renewed. Spradley Decl. ¶ 5; Ex. 1. The press release did not mention the Toddy Report or the reasons for Plaintiff's non-renewal. Spradley Decl. ¶ 5; Ex. 1. On the same day, Spradley also issued an internal directive to KCFD1 employees, notifying them of the non-renewal of Plaintiff's contract and that Spradley would take over as interim chief. Spradley Decl. ¶ 6; Ex. 2.

Between August 29 and December 14, 2013, Ford continued emailing Hedlund to schedule a hearing so Plaintiff could address Toddy's investigation. Ford Decl. Ex. EE-II. On December 6, 2013, Hedlund emailed Ford the following:

> I have had an opportunity to speak to the [Board], and the decision was made by the Board that they will not be seeking to pursue any action against Mr. Wenzel as a result of the internal investigation. The Board did not, and will not, render any decision as to the merits of the investigation.

Ford Decl. Ex. HH. Hedlund also stated that the Board was standing by its decision regarding the non-renewal of Plaintiff's employment agreement, but that he would forward any dispute to the Board at its December 18 meeting. *Id.* In prior communications with Ford, Hedlund had not mentioned that Plaintiff may be unable to address the Board. Indeed, Hedlund repeatedly

suggested that he was having discussions with the Board to schedule a hearing, and failed to respond to Ford's communications and specific questions regarding a hearing. Ford Decl. Ex. EE-GG. Ultimately, Plaintiff remained on paid administrative leave until the end of his contractual term, when his employment with KCFD1 ended on December 31, 2013.

## LEGAL STANDARD

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material of fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). The court cannot weigh the evidence or determine the truth but may only determine whether there is a genuine issue of fact. *Playboy Enters., Inc. v. Welles*, 279 F.3d 796, 800 (9th Cir. 2002). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

When a properly supported motion for summary judgment is made, the burden shifts to the opposing party to set forth specific facts showing that there is a genuine issue for trial. *Id.* at 250. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by Rule 56, designate specific facts which show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076. In assessing whether a party has met its burden, the court views the evidence in the light most favorable to the non-moving party. *Allen v. City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995).

## DISCUSSION

**I.     Defendant KCFD1's motion for summary judgment on Plaintiff's claims for procedural due process should be granted in part and denied in part.**

Plaintiff alleges the Board's vote to terminate him violated his Fourteenth Amendment rights to procedural due process. Plaintiff's due process claims are brought under 42 U.S.C § 1983, as KCFD1 is a state actor as a Rural Fire Protection Special District funded through real property taxes in Oregon. Plaintiff does not have a property interest in his continued employment with KCFD1. However, he has raised a substantial question as to whether the defendants violated Plaintiff's liberty interest in his reputation by publishing stigmatizing information in connection with his non-renewal and failing to give him a name-clearing hearing. Therefore, the defendants are entitled to summary judgment on only one of the two claims.

**a)  Plaintiff does not have a property interest in his employment with KCFD1.**

The Fourteenth Amendment of the Constitution protects against the deprivation of property without procedural due process. *Carey v. Piphus*, 435 U.S. 247, 259 (1978). A plaintiff has a constitutionally protected property interest in continued employment if the plaintiff has a reasonable expectation or a "legitimate claim of entitlement," not merely a "unilateral expectation," to continued employment. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). "A legitimate claim of entitlement arises if it is created by 'existing rules or understandings that stem from an independent source such as state law.'" *Brady v. Gebbie*, 859 F.2d 1543, 1548 (9th Cir. 1988) (citing *Roth*, 408 U.S. at 577).

In this case, Plaintiff's property rights are defined by his employment agreement subject to state law. Under Oregon state law, "[a]s a general rule, an employment contract creates an at-will arrangement that may be terminated by either the employee or the employer at any time." *Ewalt v. Coos-Curry Elec. Co-op., Inc.*, 202 Or. App. 257, 262 (2005) (*citation omitted*). A protected property interest may be created, however, by a contract provision stating that the

contract may only be terminated for cause. *Brunick v. Clatsop Cnty.*, 204 Or. App. 326, 332 (2006) (*citation omitted*). Where such an employment agreement is for a fixed term, the employee has a protectable property interest only for the length of that term. *Roth*, 408 U.S. at 578; *Maddox v. Clackamas Cnty. Sch. Dist. No. 25*, 293 Ore. 27, 36 (1982).

In this case, Plaintiff's employment agreement expired after three years on December 31, 2013, but would automatically renew unless KCFD1 issued a letter of intent to not renew the agreement at least 120 days before that date. Storey Decl. Ex. 2, Section 2. The agreement also contained a clause about discipline, stating that KCFD1's general disciplinary policies applied to Plaintiff, and that he may be terminated "for cause." Storey Decl. Ex. 2, Section 8. However, this clause specifically contemplates non-renewal without cause:

> Nothing in this Agreement shall be construed to include any requirement that [KCFD1] have specific cause for non-renewal of the employment agreement in accordance with the terms set forth herein.

*Id.* Therefore, the language of the agreement specifically allowed the Board to end Plaintiff's contract, for any reason, after the three-year term. Plaintiff remained on paid administrative leave until December 31, 2013, when his employment agreement expired by its own terms. Accordingly, Plaintiff's claim that he was entitled to due process fails because he had no property interest in his continued employment such that his due process rights were triggered.

Plaintiff was not de facto terminated on August 19, 2013 when he was notified of the Board's intent to not renew his contract and placed on administrative leave. Such de facto termination was found in *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), *vacated on other grounds*, 438 U.S. 901 (1978), where the Fifth Circuit held that "[s]ince suspension without pay is in reality termination, the city must provide whatever pretermination procedures the Constitution mandates prior to suspension without pay." To contrast, Plaintiff was suspended

with pay, so it cannot be said that "suspension without pay [was] in reality termination." *Id.*
Indeed, the fact that Plaintiff was suspended with pay differentiates this case from all the cases
Plaintiff relies on to assert a de facto termination on August 19.

Plaintiff also had no protectable property right in his employment through 2016 by any
implied contract. "To be binding, modification of a contract must be supported by consideration.
Where the terms of a written contract are modified by oral agreement, modification must be
shown by clear and convincing evidence." *Anderson v. Divito*, 138 Or. App. 272, 281-82 (1995)
(*citations omitted*). Plaintiff's strongest evidence in support of an implied contract is KCFD1's
decision to support Plaintiff as a candidate for an eight year term on the OFCA Board of
Directors. However, Plaintiff fails to explain how this letter of support for a position in an
outside organization is "clear and convincing evidence" of a contractual modification supported
by consideration. *Id.* Plaintiff's reliance on the finding of an implied agreement found in *Perry v.
Sindermann*, 408 U.S. 593 (1972) is similarly futile, as nothing in evidence shows KCFD1
"created a system" by its treatment of similarly situated employees, such that a protected
property interest was established. *Id.*

> **b) Plaintiff has raised an issue of material fact as to whether the defendants
> violated his liberty interest in procedural due process for failing to give him a
> hearing after the publication of the Toddy investigation and the non-renewal
> of Plaintiff's contract.**

The liberty interest that is protected by the due process clause "encompasses an
individual's freedom to work and earn a living." *Bollow v. Fed. Reserve Bank of San Francisco*,
650 F.2d 1093, 1100 (9th Cir. 1981), *cert. denied*, 455 U.S. 948 (1982). "[W]hen the government
dismisses an individual for reasons that might seriously damage his standing in the community,
*id.*, or if the government discharges an employee amidst allegations of misconduct, the employee
may have a procedural due process right to notice and an opportunity to clear his name. *Bledsoe*

*v. City of Horn Lake, Miss.*, 449 F.3d 650, 653 (5th Cir. 2006). Neither damage to reputation

alone, nor the stigma resulting from the discharge itself trigger the protections of due process.

*Paul v. Davis*, 424 U.S. 693, 701 (1976); *Wells v. Hico Indep. Sch. Dist.*, 736 F.2d 243, 256 (5th

Cir.1984). Rather, a liberty interest is infringed, and the right to notice and an opportunity to

clear one's name arises only when the employee is "discharged in a manner that creates a false

and defamatory impression about him and thus stigmatizes him and forecloses him from other

employment opportunities. *White v. Thomas*, 660 F.2d 680, 684 (5th Cir.1981). *See also Board*

*of Regents of State Colleges v. Roth*, 408 U.S. 564, 573 (1972) (discussing the Supreme Court's

recognition of a procedural due process right to notice and an opportunity to clear one's name

when the government discharges an employee in a manner that puts the employee's "good name,

reputation, honor, or integrity ... at stake").

> i.  **The Toddy Report was publicized when it was placed into the public**
> **record and when the charges were disclosed to KCFD1 staff and the**
> **OFCA, an outside organization.**

"The presence of stigmatizing information placed into the public record by a state entity,

pursuant to a state statute or otherwise, constitutes sufficient publication to implicate the liberty

interest under the due process clause of the fourteenth amendment to the United States

Constitution." *Buxton v. City of Plant City, Fla.*, 871 F.2d 1037, 1046 (11th Cir. 1989). The

Court notes that there is a circuit split on this issue. *See, e.g., Dasey v. Anderson*, 304 F.3d 148,

156 (1st Cir.2002) (without dissemination, no right to name-clearing hearing); *Hughes*, 204 F.3d

at 228 (presence of stigmatizing information in personnel file insufficient to create triable issue

on public disclosure element of liberty interest claim); *McMath v. City of Gary, Ind.*, 976 F.2d

1026 (7th Cir.1992) (information in plaintiff's personnel file may be "ticking time bomb" but

unless it is disseminated, no publication); *Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1148

(3d Cir.1988) (presence of information relating to termination in personnel file does not raise inference that defendant intends to communicate information to prospective employers). However, the Eleventh Circuit's *Buxton* holding was explicitly adopted by the Ninth Circuit in *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004) (placement of the stigmatizing information in the public record, accessible upon request, constituted publication sufficient to trigger Cox's liberty interest under the Fourteenth Amendment).[1]

In this case, it is clear that KCFD1, and the defendants in general, have been cautious not to disclose the contents of the Toddy Report to the general public.[2] However, in opposing Plaintiff's motion for a protective order early in this case, defense counsel specifically argued that the Toddy Report qualified as a public record because it was created by a KCFD1 employee with public funds. Mersereau Letter to the Court, March 30, 2016. Counsel argued that the statutory exemptions to Oregon's "very robust public records law" do not apply because KCFD1's position is that it did not impose any discipline based on the investigation. While that characterization is certainly disputed by the Plaintiff, defense counsel also noted that the report contains an "examination of the plaintiff's compliance with District policies regarding expenditures and personal time. Thus it deals with the manner in which public funds were expended, a subject that could hardly be of greater public interest." Therefore, at the very least, KCFD1's own position is that the Toddy Report is part of the public record and subject to a public records request at any time.

---

[1] The *Cox* Court also addressed qualified immunity as to the publication issue, and found that the law was clearly established even without an identical case on point. *Cox v. Roskelley*, 359 F.3d 1105, 1112 (9th Cir. 2004). Defendants only briefly raise qualified immunity concerns, but to the extent they claim it here, the Court finds the constitutional right is clearly established and defendants are not entitled to qualified immunity.
[2] Additionally, a Protective Order entered by the Court (#35) has prevented disclosure since May 18, 2016 up until now. However, this order and its protective effect will not survive the litigation.

Plaintiff presents further evidence of publication via defendant Toddy's investigation itself, during which, Toddy admits, he disclosed the charges against Plaintiff to many KCFD1 employees, asking them detailed questions about Plaintiff's use of the County credit card, his time in and away from the office, and other questions designed to probe his conduct and integrity as fire chief. In addition, Toddy had each employee sign a Garrity Warning, which stated:

> Neither your answers nor any information or evidence gained by reason of your answers can be used against you in any criminal proceeding. If you knowingly and willfully provide false statements or information in your answers, you may be disciplined up to and including discharge. The answers you furnish and any information or evidence resulting there from may be used in the course of disciplinary proceedings.

Plaintiff asserts that the warning created an impression that the investigation could have serious criminal implications – and by giving it to multiple employees, KDFD1 essentially made such stigmatizing allegations public, at least to the KCFD1 staff.

In an analogous case, an employee of a department was terminated, and in connection with that termination, a security bulletin was sent to the security captain for the plaintiff's department, which prohibited the plaintiff from entering the building. *Fontanilla v. City & Cty. of San Francisco*, 205 F.3d 1351, *2 (9th Cir. 1999). The bulletin included plaintiff's picture, along with that of one other person, and stated that both people had "made serious threats against employees of the Department." *Id.* This bulletin was posted at the security desk and was seen by "at least one" employee of the Department. With respect to plaintiff's procedural due process claim under § 1983, the Ninth Circuit concluded that the security bulletin implicated the plaintiff's liberty interest because "it jeopardized Fontanilla's good name and reputation and could foreclose employment opportunities." *Id.* The Ninth Circuit went on to hold that the plaintiff had demonstrated a triable issue of fact as to whether he was entitled to procedural due

process by presenting uncontroverted evidence that the bulletin was posted publicly and was posted in connection with Plaintiff's termination. *Id.*

Like the bulletin that was public because it was posted where it was visible to other employees, KCDF1 publicized stigmatizing information by interviewing a number of employees, by disclosing to them the specific charges against Plaintiff, and by giving them the Garrity Warning. Publication of this stigmatizing information raises a material question of fact as to whether it jeopardized Plaintiff's good name, reputation, and potential future employment.

Finally, Toddy's investigation included phone calls to the Oregon Fire Chief's Association, where again Plaintiff's attendance, credit card purchases, and truthfulness was called into question. Even had Toddy been extremely discreet in his lines of questioning with the OFCA, an outside organization, taking the facts in the light most favorable to the Plaintiff, a jury could find that the defendants publicized the charges against him.

### ii. Non-renewal with the backdrop of the Toddy investigation meets the standard for reputational damage under the liberty clause.

"In order to justify relief under the liberty clause of the 14th amendment via section 1983, plaintiff's alleged reputational damage must be entangled with some other 'tangible interests such as employment.'" *McGhee v. Draper*, 639 F.2d 639, 643 (10th Cir. 1981) ("*McGhee I*") (citing *Paul v. Davis*, 424 U.S. 693, 701, (1976)). Typically, when one's liberty interest is allegedly infringed upon by a discharge from employment, the termination or non-renewal will either explicitly state the stigmatizing factors or implicitly ratify some other stigmatizing allegations. Thus, the discharge will either cause or contribute to the alleged defamation. In either case, the defamed's liberty "to engage in any of the common occupations of life" is diminished, *Board of Regents v. Roth*, 408 U.S. 564, 572 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)), and the defamation has occurred "in the course of the termination of

employment." *Paul v. Davis*, 424 U.S. at 710. If plaintiff can show to the trier of fact that the non-renewal caused or enhanced his alleged reputational damage, he will have shown that he was entitled to a hearing or other reasonable opportunity to clear his name. *See Paul v. Davis*, 424 U.S. at 706-13; *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972).

In *McGhee v. Draper*, 564 F.2d 902 (10th Cir. 1977) ("*McGhee II*") the court considered whether a school board infringed on the liberty interest of an at-will teacher when it chose to non-renew her contract for the coming school year. The court noted that the board's letters and resolutions of non-renewal stated no formal charges or findings against the teacher. *Id.* at 910. However, the board's minutes focused attention on the allegedly pornographic materials and improper changing of grades, and affidavits held by the board charged misconduct with male students and drunkenness, all of which plaintiff denied. *Id.* The court found that "the discharge against this immediate background raised a substantial question whether the board declining to re-employ had imposed a stigma or other disability which foreclosed plaintiff's freedom to take advantage of other employment opportunities." *Id.*

Similarly, in this case, defendant KCFD1 ostensibly chose not to renew Plaintiff's contract "without cause." It did so, however, after conducting a months-long investigation into Plaintiff's financial conduct and abuse of time and County resources. The decision not to renew came down within a few short weeks of an Executive Board Meeting where the Toddy Report, alleging 1000 pages of misconduct was discussed and determined to be a sufficient reason for termination by several members of the board. Against this "immediate backdrop" then, the Court finds that Plaintiff has raised a substantial question as to whether the board's decision to non-renew his contract imposed a stigma or other disability which, without a hearing, foreclosed Plaintiff's freedom to take advantage of other employment opportunities.

### iii. If a jury finds that Plaintiff's liberty interest was impacted such that it triggered his due process rights, the Court finds as a matter of law that Plaintiff was not given a hearing sufficient for due process.

There is a strong presumption that a public employee is entitled to some form of notice and opportunity to be heard before being deprived of a property or liberty interest. *Vanelli v. Reynolds Sch. Dist. No. 7*, 667 F.2d 773, 778 (9th Cir. 1982) (citing *Goss v. Lopez*, 419 U.S. 565, 574-75 (1975); *Goldberg v. Kelly*, 397 U.S. 254, 264 (1970)). Apart from this general presumption, a court should analyze whether the timing of a hearing comports with due process, given the exigencies and circumstances of any particular case, according to the three part balancing test outlined in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Vanelli*, 667 F.2d at 778. The factors to consider include the private interest that will be affected, the risk of an erroneous deprivation of that interest through the procedures used, and the fiscal and administrative burdens that any additional procedural requirements would entail. *Id.* at 779.

Applying these factors compels the Court to determine that under these circumstances Plaintiff was not given a hearing sufficient for due process. First, the weight of the private interest at stake is apparent. Plaintiff Wenzel had a distinguished firefighting career for 40 years, and he had been fire chief for the last five. In that time he never received a negative review or any sort of disciplinary action.

Second, the risk of an erroneous deprivation was quite high. As discussed above Wenzel consistently disputed the allegations, yet the Toddy Report was finalized without his input, and he was not given an opportunity to respond to the 1000 pages of specific charges that report made against him. The only process he was given was the opportunity to read a statement to the Board on August 19 that responded to some of the charges. Wenzel stated to the Board at the time that the hearing was inadequate for him to address all of the charges brought against him in

the Toddy Report. The Board asked Plaintiff no questions, and Plaintiff was not allowed to cross examine Toddy or any of the witnesses that Toddy interviewed.

Third, the County has not raised any fiscal or administrative burden that granting a hearing would have imposed, and in fact the record shows that KCFD1 represented to Wenzel and his lawyer multiple times that he would be given such a hearing. Plaintiff and his counsel even offered to waive the 120-day notice requirement for non-renewal of his contract so that he could be given an opportunity to respond to each charge against him before the non-renewal decision was made. The Court finds that the administrative burdens in allowing him to do so would have been minimal. Therefore, considering all of the circumstances, if Plaintiff was entitled to due process, he did not receive an adequate hearing for such process.

## II.    Defendant KCFD1's motion for summary judgment on Plaintiff's claim for breach of contract should be granted in part and denied in part.

To state a claim for breach of contract, plaintiff must allege the existence of a contract, "its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff." *Slover v. Oregon State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098, 1101 (1996) (citing *Fleming v. Kids and Kin Head Start*, 71 Or.App. 718, 721, 693 P.2d 1363 (1985)).

KCFD1 did not breach its contract with Plaintiff when it did not renew his contract with 120 days' notice. Plaintiff's written agreement stated, "The term of this Agreement shall begin on January 1, 2011 and shall terminate on December 31, 2013. This Agreement will automatically extend for an additional three years, unless [KCFD1] issues a letter of intent not to renew, at least one hundred twenty days prior to December 31, 2013." Storey Decl. Ex. 2. The agreement also states, "[Plaintiff] may only be terminated for cause during the term of this Agreement or any extension thereof," but that "[n]othing in this Agreement shall be construed to

include any requirement that [KCFD1] have specific cause for non-renewal of the employment Agreement in accordance with the terms set forth herein." *Id.* These unambiguous terms allowed KCFD1 to not renew Plaintiff's contract for any reason. KCFD1 sent Plaintiff a letter of intent to not renew his contract 120 days before its expiration, and Plaintiff remained on paid leave until December 31, 2013. Therefore, KCFD1 did not breach Plaintiff's written employment agreement, as it expired by its own terms.

KCFD1 did not create any enforceable agreements with Plaintiff outside the written employment contract. As discussed above, KCFD1's decision to support Plaintiff as a candidate for an eight year term on the OFCA Board of Directors did not modify Plaintiff's employment agreement to extend until 2016, as this does not constitute "clear and convincing evidence" of a contractual modification supported by consideration. *Anderson*, 138 Or. App. at 282. Similarly, any statements made by KCFD1 regarding how the investigation would be conducted lack consideration from Plaintiff to KCFD1 such that they could be enforced. Therefore, KCFD1 did not breach any enforceable agreement with Plaintiff when it chose not to renew his contract.

While the contract agreement between the parties specifically contemplated non-renewal with 120 days' notice without cause, the Plaintiff's Amended Complaint also raises issues with the disciplinary provisions of the employment agreement. Specifically, the contract provides for progressive discipline and the right to a hearing concerning any disciplinary action or termination. The contract also incorporates other County disciplinary policies and procedures, which require an appropriate investigation of any accusations against the employee and that there be a decision issued by the Board following an investigation and fair hearing.

Based on these contractual disciplinary provisions, Plaintiff has raised an issue of material fact regarding whether the Toddy investigation was a "disciplinary action," and whether

or not the Board chose to non-renew his contract because of that investigation. Statements by

Board members at the August 6 Executive Session Board Meeting indicate that the investigation

was a substantial factor in that decision. Under the terms of the contract, if non-renewal was a

result of the investigation, than the investigation and non-renewal was inherently a disciplinary

action, which should have triggered the rights under the disciplinary provisions, including the

right to notice, a hearing, and a final decision regarding the results of the investigation. Because

a reasonable jury could find that the months-long investigation, including the publication of the

Toddy Report, was disciplinary in nature and resulted in non-renewal, KCFD1 is not entitled to

summary judgment on this issue.

### III.   All defendants should be granted summary judgment as to Plaintiff's negligence claims; the claims are precluded because he alleges only economic loss and he was not owed a heightened duty by the defendants.

Under Oregon law, "one ordinarily is not liable for negligently causing a stranger's

purely economic loss without injuring his person or property." *Hale v. Groce*, 304 Or. 281, 284

(1987). Thus, a negligence claim to recover purely economic losses "must be predicated on some

duty of the negligent actor to the injured party beyond the common law duty to exercise

reasonable care to prevent foreseeable harm." *Onita Pac. Corp. v. Trustees of Bronson*, 315 Or.

149, 159 (1992). This additional duty has been identified in certain relationships, typically

between professionals and their clients. *Id.* at 160. Outside the professional-client relationship,

the controlling question becomes whether the relationship is one "in which the party who owes a

duty of care is acting, 'at least in part, to further the economic interests of the 'client,' the person

owed the duty of care.'" *Conway v. Pac. Univ.*, 342 Or. 231, 240 (1996) (quoting *Onita Pac.

Corp.*, 315 Or. at 161).

In this case, Plaintiff alleges that purely economic losses resulted from the negligent conduct of defendants KCFD1, Hedlund, and Toddy, since the result of any negligence was that Plaintiff lost his job as fire chief. In other words, it cannot be said that Plaintiff's "person or property" was injured as a result of the defendants' allegedly negligent conduct. *Hale*, 304 Or. at 284. Any harm to Plaintiff's reputation is distinguishable from injury to his person for the purposes of the economic loss rule, as reputational harm would result in "financial losses such as indebtedness incurred and return of monies paid." *Onita Pac. Corp.*, 315 Or. at 159 n. 6. Additionally, because Plaintiff had no property interest in his employment beyond the term of his employment agreement, he cannot assert that his property was injured by the non-renewal.

The relationships between Plaintiff and the defendants did not give rise to the additional duty required under the economic loss rule. Because Plaintiff alleges purely economic damages, the defendants may only be liable for negligent actions if they were acting, "at least in part, to further the economic interests" of Plaintiff. *Onita Pac. Corp.*, 315 Or. at 161.

Plaintiff brings three negligence claims against the defendants. First, in his negligent investigation claim, Plaintiff alleges that the defendants acted negligently in performing the investigation. Second, in his negligent retention and supervision claim, Plaintiff alleges KCFD1 acted negligently by hiring Hedlund and Toddy, and by supervising them throughout the investigation since they had no experience with employment investigations and may have been biased against Plaintiff. Finally, in his negligent misrepresentation claim, Plaintiff alleges that Hedlund and Toddy acted negligently by submitting the Toddy Report to KCFD1, since the report was filled with misrepresentations and created false impressions about Plaintiff. In all three negligence claims, the alleged negligent actions pertain to the investigation. In performing the investigation, however, the defendants were not acting to further Plaintiff's economic

interest. Instead, the purpose of the investigation was to determine whether Plaintiff had violated KCFD1 policies, so the defendants acted to further KCFD1's economic interest in preventing policy violations. Even assuming Hedlund and Toddy's purpose was to influence KCFD1 into terminating Plaintiff, they would be acting to further their own economic interests, not Plaintiff's. Therefore, because Plaintiff alleges purely economic damages, and the defendants' allegedly negligent actions were not in furtherance of Plaintiff's economic interests, the defendants should be granted summary judgment and Plaintiff's negligence claims should be dismissed.

IV. **Defendant KCFD1's motion for summary judgment as to Plaintiff's wrongful discharge claim should be denied. A reasonable jury could find that Plaintiff was wrongfully discharged for fulfilling an important public duty.**

Under Oregon law, "[t]he tort of wrongful discharge stands as an exception to the usual rule that at-will employees can be discharged at any time for any reason." *Eusterman v. Northwest Permanente, P.C.*, 204 Or. App. 224, 229 (2006) (citing *Babick v. Oregon Arena Corp.*, 333 Or. 401, 407 (2002)). Courts "recognize two general types of wrongful discharge: (1) discharge for exercising a job-related right that reflects an important public policy..., and (2) discharge for fulfilling an important public duty.... [The] court cannot create a public duty but must find one in constitutional or statutory provisions or case law. To establish a duty, statutes cannot merely express a general public policy; rather, they must encourage specific acts or 'otherwise demonstrat[e] that such acts enjoy high social value.'" *Id.* at 229-30 (*citations omitted*).

In this case, a jury could find that Plaintiff was discharged, via non-renewal of his employment agreement, for refusing to unilaterally change KCFD1's minimum staffing levels during labor negotiations. This action by Plaintiff is most appropriately categorized as fulfilling

an important public duty; it "involve[s] obligations that [Plaintiff] was required to fulfill, rather than benefits that he was entitled to as an employee." *Id.* at 230 n. 2.

While representing KCFD1 in labor negotiations, Plaintiff was contacted by Hedlund on behalf of the Board. In two separate emails, Hedlund requested that Plaintiff eliminate overtime via lowering minimum staffing levels. Plaintiff refused this request, as he believed that action would be unlawful and an unfair labor practice. Plaintiff contacted Storey to resolve the disagreement, and the two met with Hedlund in a private meeting. Plaintiff states that during this meeting, Hedlund became "angry and embarrassed as a result of the confrontation and being wrong on the legal issue." Wenzel Decl. ¶ 20. Beginning the next day, a series of emails regarding Plaintiff's performance as fire chief were catalogued by Hedlund or exchanged between Hedlund and Storey.

First, Plaintiff's refusal to unilaterally lower minimum staffing levels during labor negotiations fulfilled an important public duty, as defined by statutory law. Under ORS 243.672(1)(e), Plaintiff had a duty as a representative of KCFD1 to "bargain collectively in good faith" with the firefighter's union representatives. "That duty to bargain in good faith obligates public employers to negotiate with respect to mandatory subjects of collective bargaining. A public employer, such as [KCFD1], commits a *per se* unfair labor practice if it 'institutes a unilateral change to the status quo involving a mandatory subject of bargaining.'" *Amalgamated Transit Union, Div. 757 v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 250 Or. App. 681, 684 (2012) *(citations omitted)*. In KCFD1's negotiations with the firefighter's union, minimum staffing levels were a mandatory subject of the bargaining, so unilaterally changing them would have constituted a *per se* unfair labor practice. Therefore, by refusing to do so, Plaintiff fulfilled

an important public duty which, as demonstrated by statute and case law, enjoys high social value.

Whether Plaintiff was terminated because he acted to fulfill a public duty then becomes a question of fact for a jury. Plaintiff states that, prior to the events at issue here, he had never received disciplinary action or been threatened with possible disciplinary action in any job. There is also no evidence of any discussion within KCFD1 about Plaintiff's poor job performance until the day after Plaintiff's private meeting with Hedlund and Storey. Additionally, the investigation that followed was performed by Toddy, a long-time professional acquaintance of Hedlund, who had no prior experience with workplace investigations. Shortly after having access to the Toddy Report, Plaintiff began contesting that the Toddy Report contained false and misleading statements. However, Plaintiff was never afforded an opportunity to refute the allegations against him, as the Board was given access to the Toddy Report before he knew what it said. From this evidence, viewed in the light most favorable to Plaintiff, a reasonable jury could conclude that the investigation was initiated as retaliation for Plaintiff's refusal to follow Hedlund's request.

After Board members accessed the Toddy Report, and during the August 6 special meeting, the Board contemplated terminating Plaintiff. Because a jury could then conclude that the investigation and resulting Toddy Report caused the Board to not renew Plaintiff's employment agreement, a genuine factual dispute remains regarding Plaintiff's wrongful termination claim against KCFD1.

The Court notes that this analysis does not change merely because Ms. Storey and the Board ultimately agreed with Plaintiff regarding the staffing issue. Nothing in the law says that an employer must force the employee into not fulfilling the public duty prior to acting in retaliation over the issue. Indeed, if that were the case, every employer could simply agree with

the lawful fulfillment of the public duty by the employee, and then summarily terminate that employee's employment for raising the issue, and the employee would have no recourse. The entire purpose of a wrongful discharge claim would be defeated, and the Court declines to contemplate such an outcome.

Finally, the existence of a § 1983 claim in this case does not preclude Plaintiff's wrongful discharge claim. Defendants cite to *Baynton v. Wyatt*, which indeed did hold that "a plaintiff suing under § 1983 for First Amendment retaliation has the same remedies as under her wrongful discharge claim, and the analysis does not require the court to determine the merits of the claim; rather the court evaluates whether the claim, if proven, provides an adequate remedy." 411 F. Supp. 2d 1223, 1225 (D. Or. 2006). The difference in this case, of course, is that Plaintiff is not suing KCFD1 for First Amendment retaliation, but for violation of his procedural due process rights. Whether or not Plaintiff received all the procedural process he was due prior to his non-renewal is not the same question as whether or not the reason for his non-renewal was lawful or wrongful. One is a process question and the other is a substantive question. Defendants cite to no cases holding that a Plaintiff is precluded from bringing both a due process claim under § 1983 and a wrongful discharge claim. Summary judgment on this claim should be denied.

## V.     A reasonable jury could find that KCFD1 breached its duty of good faith and fair dealing; summary judgment on this issue should be denied.

Under Oregon law, "[t]he law imposes a duty of good faith and fair dealing in the performance and enforcement of every contract." *Sheetz v. Knight*, 308 Or. 220, 233 (1989). The purpose of the duty "is to prohibit improper behavior in the performance and enforcement of contracts, and to ensure that the parties 'will refrain from any act that would have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'" *Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or. App. 434, 445 (2010) (quoting *Iron Horse*

*Engineering v. Northwest Rubber*, 193 Or. App. 402, 421 (2004)). A party may violate the covenant of good faith and fair dealing without breaching the express terms of the contract. *Id.* The covenant, however, "'cannot contradict an express contractual term, nor otherwise provide a remedy for an unpleasantly motivated act that is expressly permitted by the contract.'" *Id.* (quoting *Zygar v. Johnson*, 169 Or. App. 638, 645 (2000), *rev. den.*, 331 Or. 584 (2001)).

In this case, KCFD1 did not breach the covenant of good faith and fair dealing by terminating Plaintiff's employment, as an express contractual term of the employment agreement contemplated non-renewal without cause. On the other hand, KCFD1 may have breached the covenant in how it handled the investigation of Plaintiff.

Specifically, not allowing Plaintiff an opportunity to rebut the evidence against him, while continually stating that he would have such an opportunity, may constitute an "act that [had] the effect of destroying or injuring the right of [Plaintiff] to receive the fruits of the contract." *Iron Horse Engineering*, 193 Or. App. at 421. The transcript of the August 6 meeting shows that the Board was contemplating terminating Plaintiff based on the Toddy Report without knowing the truth of the allegations. Furthermore, at the August 19 meeting, Plaintiff offered to extend the 120 day notice requirement for non-renewal of his employment agreement so he could refute the allegations in the Toddy Report. The Board denied Plaintiff this opportunity and voted to not renew his employment agreement.

KCFD1 contends that the non-renewal of Plaintiff's agreement was due to its deteriorating financial situation under Plaintiff's leadership. However, KCFD1 became aware of that situation in May, 2013, and only began discussing the termination of Plaintiff after the Toddy Report became available. Thus, because a reasonable jury could find that KCFD1 would not have terminated Plaintiff's employment if not for the investigation and Toddy Report, it

could also find that KCFD1 breached its duty of good faith and fair dealing by denying Plaintiff an opportunity to refute the allegations against him. Since allowing Plaintiff this opportunity was specifically contemplated in his employment agreement, Plaintiff was denied the right to receive the fruits of the contract. Summary judgment on this claim should be denied.

## VI.    Defendant Hedlund and Toddy's motions for summary judgment as to Plaintiff's claims for tortious interference should be denied.

Plaintiff brings claims for tortious interference with economic relations against defendants Hedlund and Toddy, alleging that they conducted the investigation in a biased manner, intending to cause KCFD1 to terminate Plaintiff's employment due to Hedlund's own personal animus against him. Both defendants move for summary judgment. The motions should be denied because a reasonable jury could find that Hedlund and Toddy interfered with Plaintiff's economic relations and because Plaintiff has raised a question of fact as to whether Hedlund was acting within the scope of his lawyer-client relationship.

### a.   A reasonable jury could find that Hedlund and Toddy interfered with Plaintiff's economic relations with KCFD1.

Under Oregon law, to prevail on a claim of intentional interference with economic relations, a plaintiff must establish: (1) the existence of a valid prospective or existing contract or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and the harm to the relationship or contract; and (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535 (1995) (*citations omitted*).

A plaintiff cannot establish the third element if the alleged interferer is itself a party to the prospective relationship. *Id.* at 537. "So long as an officer or employe acts within the general range of his authority intending to benefit the corporation, the law identifies his actions with the

corporation. In such a situation the officer is not liable for interfering with a contract of the corporation any more than the corporation could be liable in tort for interfering with it." *Wampler v. Palmerton*, 250 Or. 65, 76-77 (1968). However, "if the action or advice is to serve other interests than those of the corporation there can be no immunity because it is not rendered for the purpose which gives birth to the immunity." *Id.* at 75.

In this case, Defendants Hedlund and Toddy primarily dispute the third element of Plaintiff's claim, asserting that both were parties to Plaintiff's employment agreement with KCFD1. Indeed, both defendants were employed[3] by KCFD1, and both claim to have acted within the scope of their employment in conducting the investigation. However, a factual dispute remains as to whether Hedlund and Toddy were acting to serve interests other than those of KCFD1, in that the investigation may have been initiated and conducted for retaliatory purposes.

This conclusion is supported by the timing of the accusations against Plaintiff that initiated the investigation, as they arose immediately after the confrontation between Hedlund and Plaintiff. Other supporting evidence includes the fact that Toddy was hired to perform the investigation at Hedlund's request, that Hedlund and Toddy previously held a professional relationship for many years, that the two never interviewed Plaintiff or allowed him to confront the allegations before allowing the Board access to the Toddy Report, and that the Toddy Report may have contained false and misleading information about Plaintiff.

From this evidence, a reasonable jury could find that Hedlund and Toddy did not perform the investigation in furtherance of KCFD1's interest in accurately determining whether their chief employee was violating county policies. Instead, a jury could find that Hedlund and Toddy

---

[3] The Court notes, however, that Hedlund was not an employee, but admittedly an independent contractor, and Toddy was only made an employee for insurance purposes during the limited time the investigation was on-going. Thus it is unlikely that defendant could properly be deemed a "party" to Plaintiff's employment agreement with KCFD1.

were acting to further Hedlund's interest in retaliating against Plaintiff over their disagreement. Therefore, there remains a factual dispute of whether Hedlund and Toddy were third parties to Plaintiff's employment agreement with KCFD1.

The fourth element is also in dispute; whether the interference was accomplished through improper means or for an improper purpose. Here, for similar reasons as the third element, there remains an issue of fact. That is, from the same evidence, a reasonable jury could find that Hedlund and Toddy performed the investigation for an improper, retaliatory purpose. Because a jury could also find that Plaintiff was only terminated because of the investigation, Plaintiff's intentional interference with economic relations claim cannot be dismissed.

### b. A reasonable jury could find that Defendant Hedlund acted outside the scope of the attorney-client relationship.

Oregon Supreme Court decisions hold that "a person may be jointly liable with another for substantially assisting in the other's breach of a fiduciary duty owed to a third party, if the person knows that the other's conduct constitutes a breach of that fiduciary duty." *Reynolds v. Schrock*, 341 Or. 338, 350, 142 P.3d 1062, 1069 (2006) (citing *Granewich v. Harding*, 329 Or. 47, 57, 985 P.2d 788 (1999). However, the Court has also held that "a lawyer acting on behalf of a client and within the scope of the lawyer-client relationship is protected by such a privilege and is not liable for assisting the client in conduct that breaches the client's fiduciary duty to a third party. Accordingly, for a third party to hold a lawyer liable for substantially assisting in a client's breach of fiduciary duty, the third party must prove that the lawyer acted outside the scope of the lawyer-client relationship." *Id.* at 351. Defendant Hedlund contends that this principle precludes Plaintiff's claim for tortious interference. The Court disagrees.

The Oregon Supreme Court has determined that several features of the rule are particularly important. "First, the rule places the burden on the Plaintiff to show that the lawyer

was acting outside the scope of the lawyer-client relationship." *Id.* "Second, the rule protects lawyers only for actions of the kind that permissibly may be taken by lawyers in the course of representing their clients. It does not protect lawyer conduct that is unrelated to the representation of a client, even if the conduct involves a person who is a client." *Id.* The Court explained that such unrelated conduct is by definition outside the scope of the lawyer-client relationship, and therefore no important public interest would be served by extending the "qualified privilege" to cover it. Third, for the same reason, "the rule does not protect lawyers who are representing clients but who act only in their own self-interest and contrary to their clients' interest." *Id.*

In applying the rule, the Court evaluated an attorney's conduct in advising his client to act in her own interest to the detriment of the plaintiff, a third party. The attorney took three concrete actions to advise the client to breach a fiduciary duty and to assist her in doing so, causing damage to the plaintiff. *Id.* at 354. The attorney took a fourth action in that he "accepted substantial fees for performing legal work for [the client], including the foregoing three actions." *Id.* at 355. The Court found that nothing about these actions took place outside the scope of the lawyer-client relationship or the assistance that a lawyer properly provides for a client, including the fees accepted for such actions. *Id.*

By contrast, in this case, a jury could find that Hedlund was not acting for the benefit of his client, KCFD1. As discussed above, KCFD1's interest would have been in a fair, accurate, and unbiased investigation of its chief employee. Instead, a jury could find that Hedlund was acting to further his own interest in retaliating against Plaintiff over their disagreement. Plaintiff has therefore carried his burden to raise a question of material fact as to whether Hedlund was acting outside the scope of the lawyer-client relationship by initiating the investigation and

helping Toddy to conduct the investigation in a biased way in order to cause KCFD1 to terminate Plaintiff. Defendants' motions for summary judgment as to Plaintiff's claim for tortious interference should be denied.

## VII. Plaintiff cannot sustain his common-law fraud claim because he himself did not rely on any misrepresentation; Hedlund and Toddy's motions for summary judgment should be granted.

In Oregon, "[t]he essential elements of a common-law fraud claim are: the defendant made a material misrepresentation that was false; the defendant did so knowing that the representation was false; the defendant intended the plaintiff to rely on the misrepresentation; the plaintiff justifiably relied on the misrepresentation; and the plaintiff was damaged as a result of that reliance." *Strawn v. Farmers Ins. Co.*, 350 Or. 336, 351-52 (2011).

In this case, Plaintiff alleges that defendants Hedlund and Toddy made a material misrepresentation to KCFD1 through the Toddy Report. This claim then fundamentally fails, since KCFD1, not Plaintiff, relied on the Toddy Report. Therefore, only KCFD1 may state a claim that stems from intentional misrepresentations in the Toddy Report. Other misrepresentations alleged by Plaintiff regarding the nature of the investigation create factual disputes that have been addressed in other claims. In any event, Plaintiff was damaged by KCFD1's reliance on any misrepresentations about the investigation, and was not damaged by his own reliance.

## VIII. Plaintiff's legal malpractice claim against Hedlund fails because he was not Hedlund's client.

Under Oregon law, to prove legal malpractice, a plaintiff must show: (1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) resulting harm to the plaintiff measurable in damages; and (4) causation. *Stevens v. Bispham*, 316 Or. 221, 227 (1993). An attorney for a corporation represents the entity only and not its shareholders, officers, or

employees. *In re Conduct of Campbell*, 345 Or. 670, 681 (2009). "[T]he entity may act only through its authorized representatives, and, in representing the entity, the lawyer generally must follow their directives." *Id.* (citing RPC 1.13(a)).

In this case, Hedlund was retained as legal counsel for KCFD1 per a legal services agreement, and KCFD1's authorized representatives consisted of its board of directors. Thus, Hedlund had an attorney-client relationship with KCFD1 and the Board. As an employee of KCFD1, Plaintiff did not enjoy the same attorney-client relationship such that a duty ran from Hedlund to Plaintiff. The fact that Plaintiff received legal advice related to KCFD1 business does not change the analysis, as Hedlund was still representing the Board in any matters. Because Plaintiff did not have an attorney-client relationship with Hedlund, Plaintiff's legal malpractice claim against him must be dismissed.

## IX. Defendants' motion to dismiss the KCFD1 Board of Directors should be granted.

It is undisputed that the KCFD1 Board of Directors is not a separate legal entity from the county, KCFD1, itself. Plaintiff appears to concede this issue, and the Court agrees the Board should be dismissed as a redundant party.

## RECOMMENDATION

For the reasons stated above, the defendants' motions for summary judgment (#115, #118, & # 120) should be GRANTED in part and DENIED in part. Specifically:

Defendant KCFD1's motion for summary judgment on Plaintiff's claims for procedural due process should be granted in part and denied in part. The claim regarding his property interest should be dismissed, and the claim regarding his liberty interest should go forward.

Defendant KCFD1's motion for summary judgment on Plaintiff's claim for breach of contract should be granted in part and denied in part. Breach for non-renewal should be dismissed, and breach for failure to follow the disciplinary procedures should go forward.

Defendant KCFD1's motion for summary judgment as to Plaintiff's wrongful discharge claim should be denied.

Defendant KCFD1's motion for summary judgment as to Plaintiff's claim for breach of the implied duty of good faith and fair dealing should be denied.

All three defendants' motions for summary judgment should be granted as to Plaintiff's negligence claims. Plaintiff's claims for negligent investigation, negligent retention and supervision, and negligent misrepresentation should be dismissed.

Defendant Hedlund and Toddy's motions for summary judgment as to fraud and legal malpractice should be granted and these claims should be dismissed.

Defendant Hedlund and Toddy's motions for summary judgment as to Plaintiff's claims for tortious interference should be denied. These two claims should go to trial along with the surviving claims against Defendant KCFD1.

Defendant KCFD1's motion to dismiss the KCFD1 Board of Directors should be granted.

The case should be set for trial as to the Plaintiff's claims against KCFD1 for violation of procedural due process, breach of contract, wrongful discharge, and breach of the covenant of good faith and fair dealing, as well as his claims against Hedlund and Toddy for tortious interference.

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections

are filed, any response is due within fourteen (14) days after the date the objections are filed. *See* Fed. R. Civ. P. 72, 6.

Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this _____ day of August, 2017.

_____
MARK D. CLARKE
United States Magistrate Judge